PEOPLE OF THE STATE OF NEW YORK ex rel. SUSIE CHURCH HOLLIDAY, Relator, *v.* FREDERICK SHERWOOD, Respondent, and MARIANA H. SHERWOOD, Defendant.

Supreme Court, Kings County, November, 1922.

Guardian and ward — infant orphans — stranger in blood appointed guardian by will — estrangement between father and his mother — grandmother denied custody of grandchildren in favor of guardian appointed by will of mother.

Under ordinary circumstances a grandmother has a better claim to the custody and charge of her grandchildren than a stranger by blood or one further removed in relationship.

Upon the hearing on the return of a writ of habeas corpus sued out by a grandmother, an old woman living in a small apartment in the heart of the city of New York, and who, though wealthy, has had little to do with children for many years, to obtain the custody of the two children of her son who twelve years ago married against her wishes, it appeared that petitioner's son from the time of his marriage and until his death in 1917 remained estranged from her nor did she have aught to do with his wife even up to her death in 1921. The estate of

the son was by his will given equally to his wife and their two children, now aged respectively nine and seven years, and she was appointed their guardian with power to use the income of the children's share of the estate during their minority, they to receive the principal on arriving at the age of twenty-one years, and by her will the respondent, a stranger in blood, was appointed guardian of the children and nominated as the trustee of her estate for the benefit of the children. It also appeared that petitioner neither attended the funeral of her son nor that of his wife, and that she saw her grandchildren for the first time in court on the return of the writ herein, after the death of their mother; that the father and mother of the children were very much embittered against his mother and gave strict instructions against her having any control over their children, and once the father stated that the petitioner was never a good mother to him, expressed a fear that she would harm and ill-treat the children, and frequently urged respondent to take charge of them and look after their interests, which he does; that both parents died at an early age of pulmonary trouble; that respondent and his wife live in a cozy home in the country, are young people, cultured and refined.    *Held*, that it further appearing that the children are now being educated in a private school in the state of New Jersey where the respondent and his wife live; that their musical education is progressing nicely; that they are given proper religious instruction and receive the same parental care and affection from their foster parents as is accorded by them to their own daughter, the writ will be dismissed upon the ground that the interests of the children will be best subserved by leaving them in the custody of the respondent and his wife.

Habeas corpus to obtain custody of grandchildren.

*Frederick A. Keck,* for relator.

*Frank M. Tichenor,* for defendants.

May, J.    The hearing on the return of the writ of habeas corpus herein issued at the instance of the petitioner, the grandmother of the children named in the writ, developed the following facts: Read Holliday, the son of the petitioner (hereinafter described as the father), against her wishes married, some twelve years ago, Marion Kerns Holliday, and from such union were born two children, Marion Read and Millicent Pernel Read Holliday, aged nine and seven years respectively.    From the time of his marriage until his death, on June 11, 1917, Read Holliday remained estranged from his mother; nor did the latter have aught to do with his wife, even up to the time of her death on January 22, 1921.    The petitioner attended neither the funerals of her son (the father of the children) nor of his wife, while she saw her grandchildren for the first time when she appeared in court on the return of the writ herein, subsequent to the death of the mother.    By his will the son devised his estate, valued at $120,000 and bringing in an income of $6,000 annually, equally among his wife and their two children, the former being appointed guardian of the latter with the power to use the income of the children's share of the estate during their minority, they to receive the principal on

arriving at the age of twenty-one years. By her will the mother appointed the respondent the testamentary guardian of her children, nominating him as trustee of her estate for the benefit of the children. Such appointment was made effective on April 20, 1921, by the Surrogate's Court of New York county. The acquaintance between the father and mother of the children and the respondent and his wife began in 1913, when the former couple took up their residence in Fanwood, N. J., near the home of the respondent. Immediately there sprung up among them a close and intimate friendship, which lasted until the death of the mother. During their lifetime the father and mother, who evidently were very much embittered against the petitioner, gave strict instructions against her having any control over their children. The father had once stated that she was never a good mother to him and had also expressed a fear that she would harm and ill-treat them. He frequently urged the respondent to take charge of them and to look after their interests. After the death of Read Holliday (who was never robust), and about December, 1918, his wife was taken ill with influenza, and then placed one of her children in the care of the respondent, and about May, 1919, she left the other child with the respondent also, preparatory to her departure for the west in quest of health, for the ravages of the disease which was fast consuming her had become apparent to her. The children have remained continuously with the respondent since the times above enumerated and their appearance in court gave every indication of proper care, attention and affection. Were it not for the action heretofore taken herein by the Appellate Division there would have been no hesitancy on my part as to my course of action, though I am convinced that the modification of its original position by the Appellate Division so as to admit of the taking of oral proof — which offers the best opportunity not only of arriving at the facts but of sizing up the entire situation — was taken so that the best interests of the children could be adequately determined. Under ordinary circumstances the grandmother would have a better claim to the custody and charge of her grandchildren than would a stranger by blood or one further removed in relationship. And to this may be added here that it may be advantageous to the financial welfare of the children, since the grandmother has agreed to use no part of the principal or income of the children's estate for their maintenance, and since she may, by will, leave them a part of her very large estate. It may be noted here, however, in that connection that no amount of inquiry could induce the petitioner to state what part of her estate would go to the children in the event of her death, though it was urged as one of the reasons in the

petition herein, nor would she answer what action she would take if the application were denied. The above paragraph summarizes all that can be offered in favor of the petition. As against this we find the expressed, forceful opposition of the father, by will and by word, and the same forceful opposition on the part of the mother. Are we to assume that they were not aware of the prior legal claim of the petitioner and of the possible financial benefit to their children if they were placed under the control of the petitioner? And are we to assume, further, that their opposition was borne of pique, vengeance or a desire for satisfaction against the petitioner for her refusal to sanction or approve of their marriage, and that, moved alone by such feelings, they were ready, yes, most desirous, of sacrificing their " babies' " future welfare because of such selfish and sordid motives? When people, long ill, realize the early approach of the day when they shall leave all earthly cares behind, and in their testaments, the most sacred of instruments, make for the care of their children a continuation of the provision which they had inaugurated in their lifetime, we must accord at least some respect to their wishes and endeavor to determine, so far as we can, whether their ideas and actions were not warranted and should not be sustained. We have the right to believe — and there appears naught to suggest an inference to the contrary — that the parents of these children were refined, educated people, possessing the deepest affection for their children and manifesting, in view of their own failing state of health, an unusual amount of solicitude for their welfare. Is it not logical to assume also that they had clearly in mind the possibility of their children becoming orphans, without kith or kin other than the petitioner and her son, whom both of the parents deeply disliked, feared and mistrusted? Having in mind this general situation from the opening statement of counsel, together with the papers herein, I watched very carefully the proceeding as it developed, the witnesses as they appeared on the stand and the general conduct of all interested during the hearing, to note those little acts of omission or commission which might aid me in pushing aside the curtains of the past and in forming a better estimate of the entire matter. I did this the more particularly in order that I might not be unduly influenced by the human emotions and feelings which move us all, especially those who have children of their own. It must be borne in mind that the petitioner is an old woman, whose span of life is uncertain, who has had little to do with children for many, many years, one whose demeanor indicates a person habitually determined, resolute, dominating, unsympathetic and self-satisfied, and whose general

bearing lends itself to the impression that her action in bringing this proceeding was the result, not of the dictates of conscience, but of a desire to perform a known duty, prompted perhaps by a wish to assert her legal rights. During the hearing she sat in the court room without taking even so much as a glance at her grandchildren, her lips tightly compressed, her face stern and severe, betraying no sign of a smile of kindness or tenderness as these children moved playfully about. She remained as though ignorant of their presence. Her bearing was the more marked in contrast to that of the foster parents, the respondent and his wife, whose attitude and attention towards the children was full of love, consideration and tenderness, which feeling was quite evidently reciprocated by the children towards them. The petitioner was not at all discomfited in the court. She proved conclusively while on the stand that she was a woman always self-possessed, accustomed to the giving of orders which were promptly and implicitly obeyed, and possessed of certain strong beliefs, which she would adhere to even though the fulfilling of them entailed exaction and pain. A further important element to be borne in mind in considering the future welfare and environment of these children, both of whose parents died at an early age from pulmonary trouble, is that the petitioner lives in a small apartment in the heart of the city while the respondent lives in a cozy home in the country. While the petitioner has a house in the country, the general situation and the character of it as well as the mode of life there cannot be compared with the conditions surrounding the country home of the respondent. The respondent and his wife are young people, cultured, refined and well respected. They accord the same parental care and affection to their foster children that they do to their own daughter. These children are now being educated in a private school in Fanwood, N. J., where the respondent lives, their musical education is progressing nicely and they are given proper religious instruction. Shall we, then, give weight solely to the probable financial benefits to these children in arriving at a determination herein? Surely the parents of these children must have had such a situation in mind and yet have chosen to ignore it. The principal of the estate of the children is substantial, though not under present conditions large, and the income therefrom is more than sufficient to maintain them according to their station in life, so that such principal is steadily increasing. Have we the right even to intimate that the respondent herein is actuated by self-interest? If so, then my judgment of people and of conditions has availed me naught. We may not object to his expending the income of the children for their support, education

and development. To his own home the respondent added a room for their benefit. His own life of steady progress, developing from office boy to vice-president of a large institution, justifies the conclusion that he is possessed of the right mettle. The rule of law that has always guided the court in a question of disposition of children has been the welfare of the children. That is the sole thing that I have in mind and the sole thing that will influence me so far as I have control of the situation. I have in mind that finances have their effect. But they are not all controlling. If it were a question of financial benefit alone perhaps it would be a very simple matter to determine. But shall we permit a bare claim to legal preference plus a possible money benefit — and that indefinite and uncertain — to outweigh the expressed wish of parents now gone who best knew the situation, the healthful surroundings of children whose physical inheritance arouses grave grounds for apprehension, proper and congenial home life and influences, right training and — more important than all in some respects — loving care and attention? There is nothing in the past conduct of the petitioner, in so far as it has been presented here, which might justify the assumption that she will throw around these children the atmosphere of affection and thoughtful solicitude for their proper upbringing by which they are now surrounded. She has given no evidence of affection for these children other than her mere say so. That say so has been counteracted by her conduct towards her son with whom she had no relationship whatever during the twelve years of his married life, by her unforgiving and unrelenting attitude after his death, leaving a widow and two children, and the widow not strong, and by her attitude of indifference to the children and her general conduct during the hearing on this application. In the light of all these considerations I can see no sound reason which would justify me in setting aside the disposition of these children made by their parents — a disposition made with the utmost solemnity and after due deliberation. I am of the firm belief that the interests of the children will be best subserved by leaving them in the custody of the respondent. Writ dismissed.

Judgment accordingly.